1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

JASON ROMERO,

9

                                 Plaintiff,                    Case No. C20-1027-TL-MLP

10

        v.

11

STATE OF WASHINGTON, *et al.*,                    REPORT AND RECOMMENDATION

12

                                 Defendants.

13

14          **I.        INTRODUCTION AND SUMMARY CONCLUSION**

15          This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Jason Romero is

16   currently confined at the Monroe Correctional Complex ("MCC") – Twin Rivers Unit ("TRU").

17   Plaintiff alleges in his complaint violations of federal and state law arising out of the alleged

18   delay and denial of medical treatment. (*See* Compl. (Dkt. # 1-2).) This matter comes before the

19   Court on the parties' cross-motions for summary judgment. (Defs.' Mot. (dkt. # 42); Pl.'s Mot.

20   (dkt. # 44).) The Court, having reviewed the pending motions for summary judgment, all related

21   briefing, and the balance of the record, concludes that Defendants' motion for summary

22   judgment (dkt. # 42) should be granted in part and denied in part, and that Plaintiff's motion for

23

REPORT AND RECOMMENDATION
PAGE - 1

partial summary judgment (dkt. # 44) should be granted in part and denied in part, as further

described below.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff initially filed his complaint in Snohomish County Superior Court in June 2020.

(*See* Compl.) Plaintiff alleged therein that Defendants violated his Eighth Amendment rights and

Washington State law by delaying and denying medical treatment for his serious medical needs.

(*Id*. at 1-2, ¶ 1.) Plaintiff identified the following Defendants in his complaint: the State of

Washington; the Washington State Department of Corrections ("DOC"); Arieg Awad, M.D., and

Julia Barnett, M.D., both of whom served as Facility Medical Director at MCC at times relevant

to this complaint; Mary Gumbo, an Advanced Registered Nurse Practitioner ("ARNP") who

worked occasional shifts at MCC; and Adelaide Horne, a Physician Assistant ("PA-C") at MCC.

(*Id*. at 2-3, ¶¶ 4-9.) Plaintiff seeks an award of damages for the alleged violations of federal and

state law. (*Id*. at 12.)

Defendants removed the action to this Court in July 2020. (Dkt. # 1.) Defendants filed

their motion for summary judgment on February 28, 2022 (Defs.' Mot.), and have submitted in

support of that motion the declaration of their counsel, Gauri Shrotriya Locker (Am. Locker

Decl. I (dkt. # 65)).[1] Plaintiff filed his motion for partial summary judgment on the same date

(Pl.'s Mot.), in addition with declarations of Plaintiff (Romero Decl. I (dkt. # 45)), Plaintiff's

---

[1] Defendants submitted a declaration of counsel in conjunction with their summary judgment motion but failed to properly authenticate the exhibits attached thereto. Defendants were therefore directed to properly authenticate those exhibits as well as the exhibits attached to a declaration of counsel submitted in support of Defendants' response to Plaintiff's motion for partial summary judgment which were similarly deficient. (Dkt. # 63.) Defendants submitted amended declarations of counsel in response to that directive. (Dkt. ## 64, 65.)

REPORT AND RECOMMENDATION
PAGE - 2

expert witness Dr. Todd Lefkowitz (Lefkowitz Decl. I (dkt. # 46)), and Plaintiff's counsel (Parker Decl. I (dkt. # 47)).

On March 21, 2022, Defendants filed a response to Plaintiff's motion for partial summary judgment (Defs.' Resp. (dkt. # 53)), and they have submitted in support of that response another declaration from their counsel (Am. Locker Decl. II (dkt. # 64)). Plaintiff filed a response to Defendants' motion for summary judgment on the same date (Pl.'s Resp. (dkt. # 55)), together with additional declarations from Plaintiff's counsel (Parker Decl. II (dkt. # 56)), Plaintiff (Romero Decl. II (dkt. # 57)), and Plaintiff's expert (Lefkowitz Decl. II (dkt. # 58)). Defendants filed a reply brief in support of their summary judgment motion on March 25, 2022 (Defs.' Reply (dkt. # 59)), together with a third declaration from their counsel (Locker Decl. III (dkt. # 60)). On the same date, Plaintiff filed a reply brief in support of his summary judgment motion. (Pl.'s Reply (dkt. # 61).)

## B.    Factual History

Plaintiff suffers from an eye disease, keratoconus, which causes the corneas of his eyes to bulge outward, resulting in significant vision distortion and impairment. (Romero Decl. I at ¶ 2.) Plaintiff first received treatment for this disease in 2003 at Harborview Medical Center ("HMC"). (*Id*. at ¶ 3.) At that time, Plaintiff's treatment took the form of eye drops and pain management medication. (*Id*.) On June 3, 2009, Plaintiff received a cornea transplant in his left eye to treat the vision loss and distortion caused by the keratoconus. (Parker Decl. I, Ex. E.) Plaintiff was confined at MCC at that time, and the surgery was performed by Dr. Tueng T. Shen at HMC. (*Id*.)

In December 2010 and January 2011, similar procedures were performed on Plaintiff's right eye by Dr. Shen. (Parker Decl. I, Exs. F, G.) Plaintiff thereafter had regular follow-up

REPORT AND RECOMMENDATION
PAGE - 3

appointments with Dr. Shen to monitor his condition. (Romero Decl. I at ¶ 5.) In 2013, Plaintiff was "re-incarcerated" and was held at the King County Jail where he was provided follow-up appointments with Dr. Shen every three months through September 2014. (*Id*. at ¶ 6.) At an appointment with Dr. Shen in September 2014, Dr. Shen noted that Plaintiff's left eye corneal graft was stable, and she prescribed prednisolone drops to be used every other day in both eyes. (Parker Decl. I, Ex. H at 1.) Dr. Shen indicated that Plaintiff should return for follow-up care in two to three months, but this did not occur. (*See id*.; Romero Decl. I at ¶ 7.)

On April 1, 2015, Plaintiff was transferred from the King County Jail to the intensive management unit at MCC where he remained until June 1, 2015, when he was transferred to the MCC-TRU. (Romero Decl. I at ¶ 8.) On October 20, 2015, MCC medical provider ARNP Mary Keppler submitted a consultation request for an ophthalmology appointment for evaluation of "corneal ulcers, rejection status and consideration for steroids." (Parker Decl. I, Ex. I.) The consultation request noted that Plaintiff "[b]egan an episode of rejection~few weeks ago." (*Id*.) The request was approved by Dr. Kenneth Lauren the following day and, on November 2, 2015, Plaintiff was seen by an outside provider who diagnosed a graft rejection in Plaintiff's left eye and prescribed eye drops. (*Id*.) On November 4, 2015, Plaintiff was apparently seen again by an outside provider for further evaluation of his cornea. (*See id*., Exs. I, J.) On December 17, 2015, Plaintiff was examined by DOC optometrist Alan Copeland at TRU. (*Id*., Ex. J.) In his optometry examination report, Dr. Copeland noted the graft rejection in Plaintiff's left eye and additionally noted that Plaintiff was suffering from a corneal ulcer. (*Id*.)

On April 10, 2016, Plaintiff declared a medical emergency to DOC staff because of pain and drainage in his right eye, and he was seen at the TRU infirmary. (Parker Decl. I, Ex. K.) The following day, ARNP Keppler submitted an urgent consultation request for Plaintiff to be seen

REPORT AND RECOMMENDATION
PAGE - 4

by an ophthalmologist for issues concerning his right eye. (*Id*., Exs. K, L.) In her consultation request, ARNP Keppler noted that Plaintiff had experienced similar symptoms in relation to the graft rejection in his left eye in October 2015. (*Id*., Ex. L.) ARNP Keppler's consultation request was approved by Dr. Lauren the same day. (*Id*.)

Plaintiff declared medical emergencies again on April 13 and April 14, 2016, because of eye pain, increased sensitivity, and drainage. (Parker Decl. I, Exs. M, N.) Plaintiff was apparently seen by an ophthalmologist on April 13, 2016, pursuant to ARNP Keppler's consultation request. (*Id*., Ex. O.) The ophthalmologist diagnosed a corneal ulcer in Plaintiff's right eye and corneal edema in Plaintiff's left eye, and prescribed additional ophthalmic medications to address the issue in Plaintiff's right eye. (*Id*.) The ophthalmologist also instructed that Plaintiff use prednisolone six times a day in his left eye. (*Id*.)

On April 17, 2016, Plaintiff declared another medical emergency because of eye pain, and he was admitted to the MCC Inpatient Unit. (Parker Decl. I, Exs. Q, R.) On April 22, 2016, Plaintiff was seen by Dr. Michael Banitt and Dr. Yungtai Kung at the HMC Eye Institute. (*Id*., Ex. T.) At that time, it was noted that the issue in Plaintiff's right eye was resolving, but issues remained regarding possible graft rejection in Plaintiff's left eye. (*See id*.) Plaintiff was directed to continue taking the prednisolone at that time. (*Id*.) Plaintiff was discharged from the MCC Inpatient Unit on April 27, 2016, with a discharge summary that included a plan for continued follow-up with his providers at HMC. (*Id*., Ex. S.) On or about April 29, 2016, Plaintiff was seen again by Dr. Banitt for a follow-up appointment. (*Id*., Ex. V.) Dr. Banitt recommended that Plaintiff return to the clinic in two weeks to see Dr. Shen. (*See id*.) This did not occur.

On October 4, 2016, Plaintiff was seen by several members of the DOC medical staff for complaints of eye pain, blurry vision, itchiness, and drainage in his right eye. (Parker Decl. I, Ex.

REPORT AND RECOMMENDATION
PAGE - 5

W.) He was taken to Northwest Eye Surgeons later the same day for evaluation of his right eye where they apparently removed a loose suture from the right eye. (*See* Romero Decl. I at ¶ 18; *see also* Parker Decl. I, Ex. X.) Upon his return to MCC, Plaintiff was admitted to the MCC Inpatient Unit for one day to recover from the procedure. (Romero Decl. I at ¶ 18.) At that time, Plaintiff reported to MCC staff that he had no loss of vision. (*Id*.)

On October 13, 2016, Plaintiff saw Dr. Shen for a follow-up appointment and cornea check, his first follow-up appointment with Dr. Shen since September 14, 2014. (Romero Decl. I at ¶¶ 6, 7, 19; Parker Decl. I, Ex. X.) At that appointment, Dr. Shen advised Plaintiff he needed to follow a prescribed course of Prednisolone eye drops for his transplants and, after some time using the drops, he would need another corneal transplant surgery on his left eye. (Romero Decl. I at ¶ 19; Parker Decl. I, Exs. X, Y.) Dr. Shen provided written instructions to Plaintiff's DOC providers that Plaintiff should be brought back to HMC for a follow-up appointment within two to three months, though Plaintiff was apparently not privy to this instruction. (Romero Decl. I at ¶ 22; Parker Decl. I, Ex. Y.)

On May 23, 2018, Plaintiff sent a health services kite to MCC medical stating that the vision in his left eye was gone, that he had been told by Dr. Shen at his last check-up at HMC that he would have to have another surgery, and that he believed it was time to do that surgery. (Parker Decl. I, Ex. Z.) Over a month later, on June 27, 2018, Plaintiff received a response to his kite from a medical assistant, K. Martinez, who informed him that he had an appointment scheduled for the following day and instructed him to bring his glasses. (*Id*.) On June 28, 2018, Plaintiff was seen by ARNP Gumbo and another MCC nurse who performed a visual acuity test during which Plaintiff indicated that he had no vision in his left eye. (*Id*., Ex. AA.) Thereafter, on July 10, 2018, ARNP Gumbo submitted a consult request for Plaintiff to be seen by optometry

REPORT AND RECOMMENDATION
PAGE - 6

for an evaluation for new glasses, and the request was forwarded to Dr. Barnett for approval. (*See id.*, Exs. BB, D (Barnett Dep. at 62:9-63:8).) Dr. Barnett withdrew the consult and referred it back to ARNP Gumbo for her to gather additional information. (*See id.*, Exs. D (Barnett Dep. at 63:13-24, 66:11-67:11), GG.) Nothing in the record indicates whether ARNP Gumbo, who was not a full-time DOC employee but was instead a per diem worker who covered shifts for regular DOC providers (*see* Parker Decl. II, Ex. B (Gumbo Dep. at 5:11-13)), ever received Dr. Barnett's request for additional information.

On November 18, 2018, Plaintiff submitted another health services kite asking if he had been scheduled for surgery. (Parker Decl. I, Ex. DD.) PA-C Horne responded to the kite, informing Plaintiff that he had no surgery scheduled, but that he had been scheduled to see an optometrist for evaluation. (*Id.*) Plaintiff was instructed to sign up to be seen by a provider "if the issue has worsened." (*Id.*)

On January 14, 2019, Plaintiff submitted yet another health services kite, this time explaining that Dr. Shen had told him over two years prior that he needed another transplant for his left eye. (Parker Decl. I, Ex. EE.) Plaintiff further explained that he had completely lost vision in his left eye. (*Id.*) On January 17, 2019, PA-C Horne responded to the kite, informing Plaintiff that he would be scheduled for an ophthalmology appointment soon. (*Id.*) On the same day, PA-C Horne entered a consultation request in which she noted that Plaintiff was complaining of blindness in his left eye and that he was "last seen by ophthalmology 2 years ago, lost to follow-up." (*Id.*, Ex. FF.) Dr. Awad approved the consultation request the following day. (*Id.*)

Also on January 17, 2019, PA-C Horne wrote an incident report regarding the failure to follow-up with ophthalmology in Plaintiff's case. (Parker Decl. I, Ex. GG.) PA-C Horne

REPORT AND RECOMMENDATION
PAGE - 7

indicated therein that after reviewing Plaintiff's records, she discovered that Plaintiff was last

seen by ophthalmology in October 2016, and that the consult sheet stated he would need corneal

surgery in his left eye and requested follow-up in two to three months. (*Id.*) PA-C Horne further

noted that an optometry consult had been placed by ARNP Gumbo in "July 2017"[2] for total loss

of vision in Plaintiff's left eye, that Dr. Barnett had withdrawn the consult with a note stating,

"Provider to reassess pt and re-enter with clarification," and that there was no indication in

Plaintiff's chart that there had been any follow-up since the consult was withdrawn. (*Id.*)

On January 25, 2019, Plaintiff was seen by ARNP Gumbo for follow-up with respect to

his left eye. (Parker Decl. I, Exs. HH, II.) ARNP Gumbo confirmed at that time that Plaintiff was

"due to be scheduled to see an ophthalmologist for evaluation." (*Id.*) The DOC medical

scheduler scheduled an appointment for Plaintiff with the HMC Eye Institute because Plaintiff

had an established relationship with that clinic. (Am. Locker Decl. I, Ex. D at 3.) However,

because Plaintiff had not been seen by Dr. Shen for three years, there was a long wait list, and

the next available appointment was not until June 11, 2019. (*Id.*) The scheduler thereafter

contacted PA-C Horne, advised her of the delay in Plaintiff being seen by Dr. Shen, and asked if

she wanted Plaintiff to be scheduled at another clinic if the appointment needed to be sooner.

(*Id.*) Dr. Awad responded to the scheduler's inquiry, advising that Plaintiff could be seen at

another clinic given that it had been a long time since Plaintiff was supposed to have received

follow-up. (*Id.*) The scheduler thereafter secured an appointment for Plaintiff to be seen at

Northwest Eye Surgeons on March 8, 2019. (*Id.* at 2.)

On March 8, 2019, Plaintiff was seen by an optometrist at Northwest Eye Surgeons

---

[2] It appears that the reference to July 2017 is a typographical error. The record makes clear that ARNP Gumbo submitted her consult request in July 2018. (*See* Parker Decl. I, Ex. BB.)

REPORT AND RECOMMENDATION
PAGE - 8

who noted the corneal graft failure in Plaintiff's left eye but determined Plaintiff needed no

treatment at that time. (*See* Parker Decl. I, Exs. JJ, KK.) On April 11, 2019, Plaintiff sent another

health services kite asking if he had been scheduled for surgery, and he was advised by the

scheduler that he had only been scheduled for an appointment. (*Id.*, Ex. LL.)

On June 11, 2019, Plaintiff was seen by Dr. Shen. (Parker Decl. I, Ex. MM.) Plaintiff

reported to Dr. Shen that his vision had been completely gone in his left eye for six months. (*See*

*id.* at 1.) Dr. Shen's notes of this encounter state: "Patient lost to follow-up with us for several

years and visual acuity left eye now found to be no light perception visual acuity with high

intraocular pressure." (*Id.*) Dr. Shen also indicated that there was likely damage to the eye due to

high intraocular pressure, she recommended eye protection, and she emphasized the importance

of timely follow-up. (*Id.*) In the consultation report sent by Dr. Shen to the DOC following the

appointment, Dr. Shen stated:

> This patient is well known to your system of having two corneal transplant
> surgeries. He NEEDS to be evaluated every 4-6 months. The result of lost follow
> up is being blind in the left eye. We can't do anything to reverse the condition.
>
> I hope you will provide timely follow up appointment to help him with his right
> eye so he does not go blind in that eye.

(*Id.*, Ex. NN.)

On September 17, 2019, Plaintiff was seen again by Dr. Shen for a follow-up

appointment. (Parker Decl. I, Ex. PP.) Plaintiff reported at that time that his vision had been

completely gone since November 2018. (*Id.* at 2.) Dr. Shen again recommended that the corneal

transplant in Plaintiff's left eye not be repeated because there was no light perception in the eye.

(*See id.* at 4.)

REPORT AND RECOMMENDATION
PAGE - 9

1    In June 2021, Plaintiff filed a grievance because it had been over six months since his last

2    appointment with Dr. Shen. (Romero Decl. I at ¶ 35, Ex. A.) Plaintiff's previous appointment

3    had been on November 23, 2020, at which time Dr. Shen had recommended that Plaintiff follow

4    up with her every four to six months. (*See id*.) The allegations in Plaintiff's grievance were

5    substantiated, and Plaintiff was seen again by Dr. Shen on July 27, 2021. (*Id*. at ¶¶ 37, 38.)

6    Plaintiff's next appointment was likewise delayed. (*Id*. at ¶¶ 38-40.) The record does not indicate

7    when Plaintiff was last seen by Dr. Shen.

8    **C.    Plaintiff's Claims**

9    Plaintiff identifies four causes of action in his complaint. Plaintiff first alleges that Dr.

10   Awad, Dr. Barnett, ARNP Gumbo, and PA-C Horne violated his Eighth Amendment rights when

11   they failed to provide him adequate medical care despite the fact that his medical records showed

12   a need for timely treatment and despite his own efforts to inform them of urgent developments in

13   his condition. (Compl. at 8-9, ¶¶ 39-44.) Plaintiff alleges in his second claim for relief that all

14   Defendants were negligent in failing to follow his doctor's instructions, and in unreasonably

15   delaying treatment, which caused his existing eye condition to worsen to the point that he

16   became permanently blind in his left eye. (*Id*. at 9-10, ¶¶ 45-48.)

17   Plaintiff alleges in his third claim for relief that all Defendants committed medical

18   malpractice when the DOC failed to coordinate the necessary steps for Plaintiff to access care

19   with outside providers at facilities equipped to provide him with the corneal transplant Dr. Shen

20   informed them he needed. (*See* Compl. at 10-11, ¶¶ 49-50.) Plaintiff further alleges that because

21   of delays in care caused by the DOC, his condition progressed rapidly and became incurable. (*Id*.

22

23

REPORT AND RECOMMENDATION
PAGE - 10

at 11, ¶ 51.) Finally, Plaintiff alleges that Dr. Awad, as Plaintiff's primary care provider and the Facility Medical Director[3], failed to appropriately monitor his condition and treatment. (*Id.* at ¶ 52.) Plaintiff maintains that Defendants' general treatment of him fell well below the medically accepted standard of care for his medical condition, *i.e.*, keratoconus. (*Id.* at ¶ 53.) Finally, in his fourth cause of action, Plaintiff asserts a claim of intentional infliction of emotional distress against all Defendants based upon their alleged refusal to treat his serious medical needs. (*See id.* at 11-12, ¶¶ 54-57.)

## III.    DISCUSSION

Defendants argue in their motion for summary judgment that Plaintiff's Eighth Amendment claim should be dismissed because he lacks the requisite evidence to demonstrate that Defendants acted with deliberate indifference to his serious medical needs. (Defs.' Mot. at 7-9.) Defendants also argue that Plaintiff's outrage claim should be summarily dismissed because there is no evidence that Defendants acted intentionally or recklessly toward him. (*Id.* at 10-11.) Finally, Defendants argue that they are entitled to partial summary judgment on Plaintiff's negligence/medical malpractice claims. (*Id.* at 11-14.) Specifically, Defendants argue that Plaintiff's negligence/medical malpractice claims should be dismissed as to the individually named Defendants and that Plaintiff should be permitted to pursue these claims solely against Defendant DOC. (*See id.* at 12-13.) Defendants further argue that this Court should find Plaintiff's own failure to timely alert DOC medical personnel about his loss of vision amounts to contributory fault. (*Id.* at 13-14.)

---

[3] Plaintiff alleges, incorrectly, that Dr. Awad is the Facility Medical Director at the Washington Corrections Center. (*See* Compl. at 11, ¶ 52.) The Court presumes that Plaintiff intended to reference MCC where Dr. Awad is the current Facility Medical Director and where Plaintiff has been confined at all times relevant to this action.

REPORT AND RECOMMENDATION
PAGE - 11

Plaintiff, in his motion for partial summary judgment, argues that he is entitled to summary judgment on the issue of liability with respect to his Eighth Amendment claims as the individual Defendants named in this action were deliberately indifferent to his serious medical needs. (Pl.'s Mot. at 9-17.) Plaintiff also seeks summary judgment on the issue of liability with respect to his claims of negligence, medical malpractice, and intentional infliction of emotional distress against the individual Defendants, the State of Washington, and the DOC. (*Id*. at 2, 17-19, 23-25.) Finally, Plaintiff seeks partial summary judgment against the State of Washington and the DOC on a theory of institutional and corporate medical negligence. (*Id*. at 19-23.)

**A.    Applicable Legal Standards**

*1.    Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the non-movant's case, or by establishing that the non-movant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the non-moving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *Id*. at 585-87.

REPORT AND RECOMMENDATION
PAGE - 12

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the non-moving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

When parties file cross-motions for summary judgment, as the parties have done here, each motion "must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The court must review the evidence submitted in support of each cross-motion. *Id.* Though the parties may each assert that there are no uncontested issues of material fact, the court must determine whether disputed issues of material

REPORT AND RECOMMENDATION
PAGE - 13

fact are present. *Id*.; *Osborn v. Butler*, 712 F. Supp. 2d 1134, 1148 (D. Idaho 2010).

2.    *Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show that: (1) he suffered a violation of rights protected by the Constitution or created by federal statute; and (2) the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

B.    **Defendants Awad, Barnett, Gumbo, and Horne**

Plaintiff asserts that Dr. Awad, Dr. Barnett, ARNP Gumbo, and PA-C Horne violated his Eighth Amendment rights when they failed to provide adequate medical treatment for his keratoconus. (*See* Compl. at ¶¶ 23-32, 39-44.) Plaintiff also asserts that these four Defendants acted negligently when they failed to timely approve and coordinate his treatment and failed to comport with the medically accepted standard of care for the treatment of keratoconus. (*See id*. at ¶¶ 23-32, 45-53.) The parties have filed cross-motions for summary judgment on these claims. (*See* Defs.' Mot.; Pl.'s Mot.)

REPORT AND RECOMMENDATION
PAGE - 14

1                    *1.    Eighth Amendment*

2          The Eighth Amendment imposes a duty upon prison officials to provide humane

3     conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes

4     ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking

5     reasonable measures to guarantee the safety of inmates. *Id*. In order to establish an Eighth

6     Amendment violation for inadequate medical care, a plaintiff must demonstrate that he had a

7     "serious medical need," and that defendants' response to that need was deliberately indifferent.

8     *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith,* 974 F.2d 1050,

9     1059 (9th Cir.1991), *overruled on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133

10    (9th Cir. 1997) (en banc)).

11         A prison official is deliberately indifferent to a serious medical need if he "knows of and

12    disregards an excessive risk to inmate health." *Farmer*, 511 U.S. at 837. To be found liable under

13    the Eighth Amendment, "the official must both be aware of facts from which the inference could

14    be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*.

15    "If a [prison official] should have been aware of the risk, but was not, then the [official] has not

16    violated the Eighth Amendment, no matter how severe the risk." *Gibson v. County of Washoe*,

17    290 F.3d 1175, 1188 (9th Cir. 2002); *see also Farmer*, 511 U.S. at 838 ("[A]n official's failure to

18    alleviate a significant risk that he should have perceived but did not, while no cause for

19    commendation, cannot under our cases be condemned as the infliction of punishment.").

20         Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060

21    (9th Cir. 2004). An inadvertent or negligent failure to provide adequate medical care is

22    insufficient to establish a claim under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97,

23    105-06 (1976); *see also Farmer*, 511 U.S. at 835 (finding "ordinary lack of due care" is

REPORT AND RECOMMENDATION
PAGE - 15

insufficient to establish an Eighth Amendment claim). "A defendant must purposely ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin*, 974 F.2d at 1060.

There is no dispute here that Plaintiff's keratoconus constitutes a serious medical need. The sole question is whether the four individually named Defendants were deliberately indifferent to that need. Defendants argue in their summary judgment motion that there is no evidence that any of the individual Defendants intentionally or deliberated delayed, denied, or interfered with Plaintiff's care, a prerequisite to establishing an Eighth Amendment violation. (Defs.' Mot. at 8.) Plaintiff, in his motion for partial summary judgment, identifies discrete instances in which the named Defendants were involved in some fashion in decisions regarding Plaintiff's care, and argues that Defendants, in sometimes poorly defined ways, had knowledge of Plaintiff's history of keratoconus and his need for surgery and/or additional follow-up, and deliberately ignored those needs. (*See* Pl.'s Mot. at 12-17.)

The Court will address Plaintiff's claims against each Defendant in turn.

a.    Dr. Awad

The evidence in the record demonstrates that Dr. Awad's involvement in Plaintiff's care was limited to reviewing and approving the consult request for an ophthalmology consult submitted by PA-C Horne in January 2019 after it was determined that Plaintiff had been "lost to follow-up," and providing input on the scheduling of Plaintiff's ophthalmology appointment. (*See* Parker Decl. I, Ex. FF; Am. Locker Decl. I, Ex. D at 2-3.) Because there was a wait list to see Plaintiff's HMC surgeon, Dr. Shen, MCC staff were unable to schedule an appointment with her until almost six months later. (*See* Am. Locker Decl. I, Ex. D at 2-3.) Plaintiff alleges that Dr. Awad acted with deliberate indifference when she failed to take steps to make sure Plaintiff

REPORT AND RECOMMENDATION
PAGE - 16

was immediately examined by a qualified ophthalmologist to determine if the vision in his left eye could be saved. (*See* Pl.'s Mot. at 12; Pl.'s Reply at 4-5.)

Plaintiff fails to demonstrate, however, that Dr. Awad's actions were unreasonable under the circumstances. Though Plaintiff faults Dr. Awad for not taking steps to ensure that he was immediately examined by a specialist in January 2019, the evidence shows that she did attempt to expedite Plaintiff's appointment with a specialist by authorizing him to be seen at a clinic other than Dr. Shen's. (*See* Am. Locker Decl. I, Ex. D at 2-3.) The MCC scheduler was able to secure an appointment for Plaintiff with an optometrist in March 2019 who, notably, determined that Plaintiff needed no treatment at that time. (*See id*.; Parker Decl. I, Ex. JJ.) Plaintiff offers no evidence demonstrating that Dr. Awad could have arranged for him to have been seen sooner by Dr. Shen or another ophthalmologist, or that she intentionally delayed any follow-up with knowledge that such a delay could create a substantial risk of serious harm to Plaintiff. Indeed, the optometrist's conclusion in March 2019 that Plaintiff required no treatment undermines the suggestion that his condition warranted an urgent consult with Dr. Shen.

Plaintiff also asserts that he submitted additional kites prior to January 2019 which should have put Dr. Awad on notice that he had a serious medical need and was requesting surgery. (*See* Pl.'s Mot. at 11-12; Pl.'s Reply at 4.) Plaintiff maintains that Dr. Awad, in her role as Facility Medical Director, had oversight over all MCC medical providers and he appears to suggest that Dr. Awad should have taken steps to ensure he received necessary follow-up care in response to his earlier kites. (*See* Pl.'s Mot. at 11-12; Pl.'s Reply at 4-5.)

The evidence in the record shows that Dr. Awad became the interim Facility Medical Director at MCC in approximately December 2018, following Dr. Barnett's departure, and officially became the Facility Medical Director sometime in early 2019. (Am. Locker Decl. I,

REPORT AND RECOMMENDATION
PAGE - 17

Ex. E (Awad Dep. at 22:12-23).) Plaintiff presents no evidence that he submitted any kites concerning his request for eye surgery after Dr. Awad became the interim Facility Medical Director and prior to January 2019 which would have put Dr. Awad on notice sooner that he had a serious medical need which was not being adequately addressed.

In sum, Plaintiff has come forward with no evidence, either in support of his own motion for summary judgment or in opposition to Defendants' motion for summary judgment, demonstrating that Dr. Awad was deliberately indifferent to his serious medical needs. Defendants are therefore entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim against Dr. Awad.

b.    Dr. Barnett

The evidence in the record demonstrates that Dr. Barnett's involvement in Plaintiff's care was limited to reviewing, and withdrawing, the consultation request submitted by ARNP Gumbo in July 2018 seeking an evaluation for Plaintiff for new glasses. Plaintiff alleges that Dr. Barnett acted with deliberate indifference when she withdrew the consultation request and took no further action in relation to Plaintiff's need for surgery or for follow-up with an ophthalmologist. (Pl.'s Mot. at 13.) Plaintiff argues that Dr. Barnett was "fully knowledgeable" about his history of keratoconus and graft rejection, and that she was aware from ARNP's Gumbo's consultation request in July 2018 that Plaintiff was reporting a complete loss of vision in his left eye, and yet she took no action to have Plaintiff's eyes checked or to arrange for him to be seen by an ophthalmologist. (*Id*.) Plaintiff also speculates that because Dr. Barnett holds a pharmacy degree, she should have been aware of the effects of prednisolone and the fact that it can cause increased ocular pressure and damage to the optic nerve. (*Id*.)

Plaintiff offers no support for his conclusory assertion that Dr. Barnett was "fully knowledgeable" about his condition. The evidence demonstrates only that Dr. Barnett reviewed ARNP Gumbo's consultation request, that she deemed the request deficient because of the way it had been presented, and that she requested additional information which she apparently never received. (*See* Parker Decl. I, Exs. D (Barnett Dep. at 63:13-24, 66:11-67:11), GG.) There is no indication that Dr. Barnett had any further involvement with Plaintiff's care, that she ever reviewed Plaintiff's medical records and saw the recommendations of Dr. Shen from 2016—recommendations that were made prior to Dr. Barnett's tenure at MCC—or that she ever had occasion to learn that Plaintiff had been prescribed prednisolone drops. While Plaintiff clearly believes Dr. Barnett should have had this information, there is simply no evidence that she did during her relatively short tenure at MCC.[4]

In sum, Plaintiff has come forward with no evidence, either in support of his own motion for summary judgment or in opposition to Defendants' motion for summary judgment, demonstrating that Dr. Barnett was deliberately indifferent to his serious medical needs. Defendants are therefore entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim against Dr. Barnett.

c.    PA-C Horne

Plaintiff next asserts that PA-C Horne acted with deliberate indifference when she took no steps to have him seen by an ophthalmologist after he submitted a kite on November 18,

---

[4] Plaintiff asserts in his summary judgment motion that Dr. Barnett was the acting Facility Medical Director at MCC from May 2017 until she was fired in April 2019. (*See* Pl.'s Mot. at 12.) The evidence in the record demonstrates that Dr. Barnett was suspended in October 2018, before being terminated in April 2019, and that Dr. Awad assumed responsibilities as the interim Facility Medical Director in approximately December 2018. (*See* Am. Locker Decl. II, Ex. A (Barnett Dep. at 12:3-4); Am. Locker Decl. I, Ex. E (Awad Dep. at 22:10-17).)

REPORT AND RECOMMENDATION
PAGE - 19

1    2018, asking if he had been scheduled for eye surgery. (Pl.'s Mot. at 14.) Plaintiff complains that

2    PA-C Horne responded by informing him only that no surgery had been scheduled and that he

3    was scheduled to see an optometrist for evaluation. (*Id*.) Plaintiff further complains that PA-C

4    Horne made no effort to schedule surgery or to submit a consult request for Plaintiff to be seen

5    by an outside specialist for his loss of vision at that time. (*Id*.)

6        Plaintiff argues that PA-C Horne would have had access to his patient chart at the time he

7    submitted his health services kite in November 2018, and he suggests that PA-C Horne therefore

8    must have known that his visual acuity test results were showing that he no longer had vision in

9    his left eye and that Dr. Shen had recommended periodic follow-up and additional surgery. (Pl.'s

10   Reply at 7.) Plaintiff, however, focuses on what he believes PA-C Horne should have known and

11   not what she actually did know. Plaintiff's simple inquiry in November 2018 as to whether he

12   had been scheduled for eye surgery did not necessarily require a complete review of his medical

13   records through which PA-C Horne might have discovered Dr. Shen's recommendations from

14   2016, and Plaintiff fails to demonstrate that PA-C Horne's response, *i.e.,* that he was being

15   scheduled to see an eye specialist, albeit an optometrist and not an ophthalmologist, was

16   unreasonable based on her knowledge at that time.

17       Plaintiff also faults PA-C Horne for failing to expedite an ophthalmology appointment for

18   him after he submitted a kite in January 2019 in which he advised that Dr. Shen had previously

19   indicated he would need another corneal transplant in his left eye and that he was completely

20   blind in his left eye at that point. (Pl.'s Mot. at 15; *see also* Parker Decl. I, Ex. EE.) Plaintiff

21   requested in his kite that Dr. Shen be contacted so that they could proceed with surgery. (Parker

22   Decl. I, Ex. EE.) PA-C Horne responded to the kite by submitting a consult request for Plaintiff

23   to be seen by ophthalmology. (*Id*.) Plaintiff complains that PA-C Horne submitted a two-month

REPORT AND RECOMMENDATION
PAGE - 20

consultation request rather than an urgent request to be seen by an ophthalmologist and argues that he needed to be seen by a qualified provider immediately given the lengthy delay in care he had already experienced. (Pl.'s Reply at 7-8.)

However, there is no evidence in the record that PA-C Horne purposely delayed follow-up care with knowledge that it would subject Plaintiff to a substantial risk of serious harm nor is there any evidence that the delay did, in fact, cause Plaintiff any serious harm in light of his reports beginning as early as May 2018 that he had lost all sight in his left eye. As noted above, when Plaintiff was seen by an optometrist in March 2019, she did not discern any need for treatment at that time, suggesting that she did not deem Plaintiff's condition emergent. Plaintiff fails to demonstrate that the failure to request an urgent consult rather than a routine consult was unreasonable under the circumstances.

In sum, Plaintiff has come forward with no evidence, either in support of his own motion for summary judgment or in opposition to Defendants' motion for summary judgment, demonstrating that PAC-Horne was deliberately indifferent to his serious medical needs. Defendants are therefore entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim against PA-C Horne.

### d.    ARNP Gumbo

Finally, Plaintiff asserts that ARNP Gumbo acted with deliberate indifference when she documented blindness in Plaintiff's left eye at an appointment in June 2018 and, instead of referring him for an immediate appointment with an ophthalmologist, she submitted a consultation request for an optometry evaluation for new glasses. (Pl.'s Mot. at 16.) Plaintiff maintains that he never requested new glasses and that his chief complaint at the time he saw ARNP Gumbo in June 2018 was that he had no vision in his left eye. (*Id*.) Plaintiff also appears

REPORT AND RECOMMENDATION
PAGE - 21

to fault ARNP Gumbo for failing to follow-up on Dr. Barnett's request for more information in relation to the consultation request. (*Id*. at 16-17.)

The evidence in the record establishes that ARNP Gumbo was a "per diem" worker at MCC, not a full-time employee, and that when she saw Plaintiff in June 2018, she was providing coverage for PA-C Horne. (*See* Am. Locker Decl. I (Gumbo Dep. at 7:5-16, 55:21-22).) This particular appointment was apparently scheduled in response to a medical services kite Plaintiff submitted in May 2018 requesting optometry services. (*See* Parker Decl. I, Exs. Z, AA.) Plaintiff explained in his kite that his vision in his left eye was completely gone and that he had been told by Dr. Shen at his last check up at HMC that he would have to have surgery again. (*Id*., Ex. Z.) Plaintiff suggested it was perhaps time to have the surgery. (*Id*.)

It appears that the medical assistant who responded to the kite, K. Martinez, construed it simply as a request to be evaluated for new glasses and not a request for surgery. (*See* Parker Decl. I, Ex. Z.) It is unclear from the record whether Plaintiff's reference to his need for surgery was passed along to ARNP Gumbo or any other provider. ARNP Gumbo testified at her deposition that she construed Plaintiff's primary concern as one for new glasses to aid the vision in his right eye because the vision in his left eye was gone, and her understanding was that his vision had been gone for some time. (Am. Locker Decl. I, Ex. B. (Gumbo Dep. at 56:19-21); *see also* Parker Decl. I, Ex. A (Gumbo Dep. at 49:3-21, 50:11-16).)

Consistent with her understanding of Plaintiff's concerns, ARNP Gumbo submitted a consult request recommending that Plaintiff be seen by optometry for new glasses. (*See* Parker Decl. I, Exs. A (Gumbo Dep. at 50:11-16, 50:23-51:3), BB.) Dr. Barnett deemed the consult request, as completed by ARNP Gumbo, to be deficient because the information she provided did not support the need for an outside consultation for either optometry or ophthalmology. (*Id*.,

REPORT AND RECOMMENDATION
PAGE - 22

Ex. D (Barnett Dep. at 67:3-11).) Dr. Barnett sent the consult back for ARNP Gumbo to gather

further information and resubmit the request if she deemed it appropriate to do so, but no

additional information was forthcoming. (*See id.*; Parker Decl. I, Ex. GG.) However, there is no

evidence that ARNP Gumbo was ever made aware of Dr. Barnett's request for additional

information in relation to the optometry consult and the record suggests to the contrary. (*See* Am.

Locker Decl. I, Ex. B (Gumbo Dep. at 55:13-56:1).) The record makes clear that ARNP Gumbo,

in submitting the consult request for Plaintiff to be seen by optometry, believed she was

addressing the medical needs Plaintiff was expressing to her at that time. Whether or not her

assessment of those needs was accurate, nothing in the record supports the conclusion that she

purposefully disregarded Plaintiff's medical needs.

In sum, Plaintiff has come forward with no evidence, either in support of his own motion

for summary judgment or in opposition to Defendants' motion for summary judgment,

demonstrating that ARNP Gumbo was deliberately indifferent to his serious medical needs.

Defendants are therefore entitled to summary judgment with respect to Plaintiff's Eighth

Amendment claim against ARNP Gumbo.

### 2. *Medical Malpractice/Negligence*

Plaintiff asserts a claim of medical malpractice/negligence against each of the

individually named Defendants.[5] Under Washington law, to recover damages for an injury

occurring as the result of health care, a plaintiff must establish that the "injury resulted from the

---

[5] There is some confusion in the record as to whether Plaintiff intends to assert both a general negligence claim and a professional medical negligence claim against the individual Defendants or whether, as Defendants argue, the claims are duplicative. (*See* Defs.' Mot. at 11-13; Defs.' Resp. at 8.) Plaintiff maintains that they are separate claims. (*See* Pl.'s Reply at 9.) However, so far as this Court can discern, the arguments presented in Plaintiff's motion papers as to the individual Defendants are based solely on a theory of professional medical negligence and the Court therefore addresses them as such.

REPORT AND RECOMMENDATION
PAGE - 23

failure of a health care provider to follow the accepted standard of care." RCW 7.70.030(1). In order to prove a claim alleging negligent medical treatment, a plaintiff must demonstrate the following:

> (a) The healthcare provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances;
>
> (b) Such failure was a proximate cause of the injury complained of.

RCW 7.70.040(1).

The proximate cause of an injury is "a cause which in a natural and continuous sequence, unbroken by a new, independent cause, produces the event, and without which that event would not have occurred." *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 935 (1982). The Washington Courts have consistently held that the issue of proximate cause is generally a question for the jury. *Id*. However, proximate cause may be a question of law for the court "when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion[.]" *Id*. (citations omitted).

"[I]n cases involving alleged medical negligence, if a reasonable person could infer, from the facts, circumstances, and medical testimony, that a causal connection exists, the evidence is sufficient to survive summary judgment." *Attwood v. Albertson's Food Ctrs., Inc.*, 92 Wn. App. 326, 330-31 (1998). "[E]vidence establishing proximate cause must rise above speculation, conjecture, or mere possibility." *Id*. at 331. "Thus, medical testimony must demonstrate that the alleged negligence 'more likely than not' caused the later harmful condition leading to injury; that the defendant's action 'might have,' 'could have,' or 'possibly did' cause the subsequent condition is insufficient." *Id*. (quoting Merriman v. Toothaker, 9 Wn. App. 810, 814 (1973)); *see*

REPORT AND RECOMMENDATION
PAGE - 24

*also O'Donoghue v. Riggs*, 73 Wn.2d 814, 824 (1968) ("To remove the issue from the realm of speculation, the medical testimony must at least be sufficiently definite to establish that the act complained of 'probably' or 'more likely than not' caused the subsequent disability.").

Plaintiff argues in his summary judgment motion that the four individually named Defendants failed to exercise the proper degree of skill, care, and learning expected of a reasonably prudent health care provider in treating Plaintiff's keratoconus, and thereby caused him to lose all vision in his left eye. (Pl.'s Mot. at 17-19, 24-25.) Plaintiff seeks summary judgment on the issue of liability with respect to the medical negligence claims asserted against all individual Defendants. (*See id*. at 2, 17-19, 24-25.) Defendants argue in their motion for summary judgment that Plaintiff's medical malpractice claims against the individually named Defendants should be dismissed because the named individuals did not become involved in Plaintiff's care until after he had irreparably lost vision in his left eye. (Defs.' Mot. at 12-13.) Thus, according to Defendants, a reasonable person could not infer that a causal connection exists between Defendants' alleged acts and omissions and Plaintiff's loss of vision. (*See id*.) The Court concurs that Plaintiff has not established the requisite causal connection between Defendants' alleged acts and omissions and his loss of vision.

Plaintiff presents his medical negligence argument in the broader context of alleged deficiencies in the medical care provided by DOC staff over a period of five years, from 2014 to 2019, with particular emphasis on the period of 2016 to 2019. The focal point of Plaintiff's argument is the failure of the DOC staff to provide timely follow-up appointments for Plaintiff as recommended by Dr. Shen in October 2016 and the resulting loss of vision. (*See* Pl.'s Mot. at 18.) Plaintiff offers in support of his argument declarations from his medical expert, Dr. Lefkowitz. (*See* Lefkowitz Decl. I; Lefkowitz Decl. II.)

REPORT AND RECOMMENDATION
PAGE - 25

Dr. Lefkowitz opines that the cause of Plaintiff's loss of vision was likely elevated eye pressure, attributable to the prednisolone eye drops Plaintiff had been prescribed, which damaged the optic nerve in his left eye over time. (*See* Lefkowitz Decl. I at ¶¶ 21-22.) Dr. Lefkowitz explains that increased ocular pressure is a known side effect of prednisolone, and that some people are particularly sensitive to steroids and can experience very high eye pressure. (*Id*. at ¶¶ 11, 21.) Thus, according to Dr. Lefkowitz, it is necessary to schedule regular follow-up appointments for individuals using prednisolone to ensure that the individual's eye pressure is within normal limits. (*Id*.) Dr. Lefkowitz opines that if the "DOC" had provided timely follow-up appointments, it could have been determined that the prednisolone was causing Plaintiff issues and alternative dosages or medications could have been considered. (*Id*. at ¶ 23.)

The evidence in the record reflects that prednisolone drops were prescribed for Plaintiff a number of times between November 2015 and April 2016, though it is unclear from the record whether the drops were being prescribed and used consistently during this period of time or only intermittently. (*See* Parker Decl. I, Exs. I, J, K, O, T, V.) When Dr. Shen saw Plaintiff in October 2016, she concluded that Plaintiff would need corneal transplant surgery in his left eye due to the failure of the original transplant, and she "re-start[ed]" Plaintiff on prednisolone. (*See* Parker Decl. I, Exs. X, Y.) Dr. Shen emphasized the importance of daily compliance with the steroid drops, indicating that she would not recommend repeating the corneal transplant in Plaintiff's left eye until he was compliant with the prescribed prednisolone regimen. (*See id*.) Dr. Shen thereafter specifically advised the DOC medical staff that Plaintiff "need[s] to be on Prednisolone in both eyes as long as he has the transplants – if this is not done, his transplant will fail." (*Id*., Ex. Y.)

REPORT AND RECOMMENDATION
PAGE - 26

According to Plaintiff, he carefully followed the prescribed regimen and consistently submitted refill requests with MCC.[6] (Romero Decl. I at ¶ 20.) Plaintiff indicates that in the months following his appointment with Dr. Shen he began to notice that the vision in his left eye was fading. (*Id*. at ¶ 22.) Plaintiff confirms that he did not apprise the MCC medical staff of this fact until May 23, 2018, when he sent a health services kite stating that the vision in his left eye was gone. (*See id*. at ¶¶ 22-23.) When Plaintiff subsequently appeared for the appointment scheduled in June 2018 to address this concern, he reported that the vision in his left eye was "zero," and he denied having any vision in his left eye during his visual acuity screening. (Parker Decl. I, Ex. AA.) Plaintiff described this vision test during his deposition testimony, explaining that "I did the right and read what I could, and they said Okay, switch to the left. I said, There's no point. There's – it's too blurry. I can't make anything out." (Locker Decl. III, Ex. A (Romero Dep. at 51:6-9).) Plaintiff confirms in his declaration submitted in support of his summary judgment motion that he had no vision in his left eye at the time the visual acuity test was performed in June 2018. (Romero Decl. I at ¶ 25.)

Plaintiff asserts that Dr. Awad, Dr. Barnett, ARNP Gumbo, and PA-C Horne should have acted with greater urgency when he displayed signs of severe eye damage. (Pl.'s Mot. at 18; *see also* Pl.'s Reply at 9-11.) However, Plaintiff offers no evidence that the individual Defendants' alleged failure to act during any of their specific interactions with Plaintiff in 2018 or 2019 caused the blindness in his left eye. Plaintiff's expert states that the fact that Plaintiff reported he could not see out of his left eye did not mean he was blind in that eye or could not regain his

---

[6] Plaintiff does not identify which MCC providers approved his prescription refills but does not assert it was any of the named Defendants. It is therefore unclear who among the MCC medical staff might reasonably be deemed responsible for monitoring Plaintiff's condition given the "known" side effects of the steroids.

REPORT AND RECOMMENDATION
PAGE - 27

vision, and he opines that DOC providers, *including* the individually named Defendants fell below the medically accepted standards of care by failing to monitor and examine Plaintiff's left eye when he reported loss of vision. (Lefkowitz Decl. II at ¶¶ 3, 5.) This is insufficiently specific to demonstrate that Plaintiff's vision loss can be directly attributed to the actions of inactions of any of the individually named Defendants.

Plaintiff's evidence establishes, at most, that the four individually named Defendants could possibly have contributed to Plaintiff's permanent vision loss. However, such a showing is insufficient to support a negligence claim against these individuals as Plaintiff is required to demonstrate the Defendants' actions "more likely than not" caused his blindness. A reasonable person simply could not infer from the evidence in the record that the four individual Defendants, all of whom had limited interaction with Plaintiff and all of whom interacted with Plaintiff only after he reported that he was completely blind in his left eye, more likely than not caused his blindness.

Thus, Plaintiff's evidence is insufficient to survive summary judgment and Defendants' motion should therefore be granted as to Plaintiff's medical negligence claims against the individual Defendants.

## C.    Defendants State of Washington and DOC

Plaintiff also asserts claims of negligence and medical malpractice against the State of Washington and the DOC. (*See* Compl. at ¶¶ 45-53.) In his negligence claim, Plaintiff asserts that the DOC has full control over his access to medical providers and medication and it therefore had a duty to ensure he received the medical treatment his condition warranted. (*Id*. at ¶ 46.) Plaintiff claims that the DOC breached that duty when it failed to follow the instructions of Plaintiff's doctor and unreasonably delayed treatment, thereby causing him to suffer permanent

REPORT AND RECOMMENDATION
PAGE - 28

blindness in his left eye. (*See id.* at ¶¶ 46, 48.) In his medical malpractice claim, Plaintiff asserts

that the DOC failed to properly coordinate his care to ensure access to care with outside

providers and facilities equipped to provide him with the corneal transplant Dr. Shen informed

them he needed. (*Id.* at ¶ 50.) Plaintiff further asserts that because of delays in care caused by the

DOC, his condition progressed and became incurable. (*Id.* at ¶ 51.) Finally, Plaintiff asserts that

his general treatment by DOC personnel fell below the medically accepted standard of care for

the treatment of keratoconus and that Defendants, by failing to adhere to the standard of care in

coordinating Plaintiff's corneal transplant, caused Plaintiff to suffer permanent blindness in his

left eye. (*Id.* at ¶ 53.)

Plaintiff moves for partial summary judgment on the issue of liability with respect to his

negligence claim against the State of Washington and the DOC, and he purports to argue this

claim under theories of both corporate medical negligence and general negligence. (*See* Pl.'s

Mot. at 19-24.) However, Plaintiff's arguments in support of the two theories are

indistinguishable. (*See id.*)

Defendants' briefing in relation to Plaintiff's negligence claims against the State of

Washington and the DOC is somewhat confusing. In their motion for summary judgment,

Defendants appear to concede that Plaintiff's medical malpractice claim should proceed against

Defendant DOC. (Defs.' Mot. at 13.) However, in their response to Plaintiff's summary

judgment motion, Defendants argue that Plaintiff appears to be relying on DOC's vicarious

liability for the medical negligence of employees other than the named individual Defendants to

support his medical negligence claim, and that Plaintiff has not established each element of such

a claim and/or established there are no genuine issues of material fact for trial on his medical

malpractice claim. (Defs.' Resp. at 8-9.) Specifically, Defendants argue that in order to proceed

REPORT AND RECOMMENDATION

PAGE - 29

on such a claim Plaintiff would have to establish: (1) the identity of the medical providers alleged to have been negligent; (2) how their acts or omissions fell below the applicable standard of care for their specific medical disciplines; and (3) how their alleged negligence proximately cause the harm alleged. (*Id*. at 8.) Defendants maintain that Plaintiff has not established any of these elements, and that Plaintiff's summary judgment motion on this claim must therefore be dismissed. (*Id*. at 8-9.)

Though Plaintiff's briefing on his negligence claims is not a model of clarity, the Court does not construe Plaintiff to be arguing in his motion for partial summary judgment that Defendant DOC should be held liable on a theory of vicarious liability on Plaintiff's statutory medical negligence claim. To the extent Plaintiff may be seeking to do so, the Court concurs with Defendants that Plaintiff's claims fail, and summary judgment must be denied, as Plaintiff fails to establish the necessary elements of such a claim.

The Court, however, construes Plaintiff's argument against Defendant DOC as one asserting a general negligence claim based on the DOC's independent and non-delegable duty to ensure the health and welfare of inmates in its custody. Defendants do not appear to address this argument in their response to Defendants' motion for partial summary judgment which suggests Defendants do not oppose entry of judgment with respect to this claim. The Court will nonetheless briefly address the claim.

Under Washington law, a negligence claim requires proof of the following four elements: "the existence of a duty; breach of the duty; a resulting injury; and proximate causation between the breach and the resulting injury." *Cox v. Dep't. of Soc. & Health Servs.*, 913 F.3d 831, 839 (9th Cir. 2019) (citing *Michaels v. CH2M Hill, Inc.*, 171 Wn.2d 587, 605 (2011)). Washington courts have recognized that jails owe inmates an affirmative duty to ensure their "health, welfare,

REPORT AND RECOMMENDATION
PAGE - 30

and safety." *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 635 (2010). This duty arises from the special relationship custodians have with inmates based on the complete control the custodian has over inmates who are deprived of their liberty. *See id.* (citing *Shea v. City of Spokane*, 17 Wn. App. 236, 242 (1977)); *see also Gregoire*, 170 Wn.2d at 635). The Washington Supreme Court has made clear that providing for the health of its prisoners is a non-delegable duty for the Washington DOC. *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 359 (2021).

As noted above, Defendants do not argue, nor could they, that the DOC did not owe Plaintiff a duty of care in relation to his health needs. There is ample evidence in the record that Defendant DOC breached that duty and, as a result of that breach, Plaintiff lost all vision in his left eye. Plaintiff's evidence, which has not been refuted, establishes that in October 2016, Plaintiff's eye surgeon prescribed prednisolone, emphasized the need for Plaintiff to be compliant with the prescribed regimen, and recommended that Plaintiff return to the clinic every two to three months, and that such information was provided to MCC medical personnel. (Parker Decl. I, Exs. X, Y.) Per Defendants' own admission, Plaintiff was thereafter "lost to follow-up" for a period of over two-and-half-years. (*See id.*, Exs. FF, GG.) Dr. Lefkowitz and Dr. Shen both make clear that the failure to provide proper follow-up resulted in Plaintiff's blindness. (*See id.*, Exs. MM at 1, NN; Lefkowitz Decl. I at ¶¶ 22-23.) Defendants do not contest these facts.

The only argument Defendants make in this regard is that Plaintiff should be found to be comparatively at fault for his injury based upon his failure to timely alert DOC medical personnel about his failing vision before he lost vision, his failure to declare a medical emergency when he began to lose vision, and his failure to alert DOC medical staff that he was "waiting for surgery" until after he had completely lost his vision in his left eye. (Defs.' Mot. at 13-14.)

REPORT AND RECOMMENDATION
PAGE - 31

Washington has adopted contributory fault as a method of apportioning damages between a negligent defendant and a negligent plaintiff. *See* RCW 4.22.005. RCW 4.22.070(1) provides that:

> In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages . . . The entities whose fault shall be determined include the claimant or person suffering personal injury. . . .

RCW 4.22.015 defines "fault" as follows:

> "Fault" includes acts or omissions . . . that are in any measure negligent or reckless toward the person or property of the actor or others. . . . The term also includes . . . unreasonable assumption of risk, and unreasonable failure to avoid an injury or to mitigate damages. Legal requirements of causal relation apply both to fault as the basis for liability and to contributory fault.

The Washington courts have made clear that the issue of contributory negligence is generally one for the jury. *Bordynoski v. Bergner*, 97 Wn.2d 335, 340 (1982); *see also Bertsch v. Brewer*, 97 Wn.2d 83, 91 (1982). "[A] finding of contributory negligence as a matter of law should be made 'only in the clearest of cases' and 'a condition precedent for such a determination is a conclusion that reasonable minds could not have differed in their interpretation of the factual pattern.'" *Bordynoski*, 97 Wn.2d at 338 (quoting *Browning v. Ward*, 70 Wn.2d 45, 48-49 (1966)).

This is not such a clear case that a finding of contributory negligence as a matter of law is warranted. While Plaintiff might arguably have alerted DOC medical personnel when he began to lose his vision rather than after it was completely gone, Plaintiff understood that he was supposed to have additional surgery once he demonstrated compliance with the steroid regimen and he states that he believed his deteriorating vision would be resolved once he received that surgery. (*See* Romero Decl. I at ¶¶ 19-20, 22.) Plaintiff was, and is, entirely dependent on DOC

REPORT AND RECOMMENDATION
PAGE - 32

medical personnel to provide follow-up care and schedule necessary appointments. The Court observes that that even when Plaintiff contacted medical personnel and was specific about his needs, the response he received was underwhelming.

A particular example of this is the kite Plaintiff sent in May 2018 in which he indicated he was supposed to receive surgery on his left eye and his vision was gone. The response Plaintiff received from the medical assistant was that he had been scheduled for an optometry appointment. There is no indication that the medical assistant notified the provider that Plaintiff's request was not simply for a new pair of glasses, but for the previously recommended surgery, or that the medical assistant in any way followed up Plaintiff's expressed need for surgery. Whether or not Plaintiff's vision loss could have been reversed at that point is unknown. It is, however, an example of the apparently ineffectual lines of communication and coordination within the DOC/MCC health care scheme.

In this Court's view, reasonable minds could well differ on their interpretation of the facts in this case, and therefore, the Court recommends that Defendants' motion for summary judgment on the issue of contributory fault be denied.

### D.    Intentional Infliction of Emotional Distress

Plaintiff asserts in his complaint a claim of intentional infliction of emotional distress against all named Defendants. (Compl. at ¶¶ 54-57.) Specifically, Plaintiff asserts that Defendants had direct knowledge of his history of keratoconus and intentionally inflicted emotional distress upon him when they refused to treat his serious medical needs. (*Id.* at ¶ 55.) Defendants, in their motion for summary judgment, argue that they are entitled to summary judgment with respect to this claim because Plaintiff's allegations fail to establish outrage and

REPORT AND RECOMMENDATION
PAGE - 33

there no evidence to support the claim.[7] (Defs.' Mot at 10-11.) Plaintiff, in the introduction to his motion for partial summary judgment, requests that he be granted summary judgment on his claim of intentional infliction of emotional distress. (Pl.'s Mot. at 2.) However, Plaintiff presents no argument in his motion concerning this claim. Plaintiff likewise fails to present any argument in opposition to Defendants' request for summary judgment with respect to this claim in his response to Defendants' motion and, indeed, none of Plaintiff's briefing makes any further reference to this claim. (*See* Pl.'s Resp.)

Defendants, in their reply brief in support of their motion for summary judgment, argue that Plaintiff's failure to address their arguments with respect to his outrage claim is a tacit admission that the outrage claim should be dismissed. (Defs.' Reply at 1.) The Ninth Circuit has held that a plaintiff abandons claims by not raising them in opposition to a defendant's motion for summary judgment. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008); *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005). Based on this authority, this Court concludes that the absence of any opposition by Plaintiff to Defendants' motion for summary judgment on his intentional infliction of emotional distress claim is properly construed as an abandonment of that claim by Plaintiff. The Court therefore recommends that Plaintiff's intentional infliction of emotional distress claim be summarily dismissed.

## IV.    CONCLUSION

Based on the foregoing, this Court recommends that: (1) Defendants' motion for summary judgment (dkt. # 42) be GRANTED as to Plaintiff's Eighth Amendment claims, and as

---

[7] Though Plaintiff asserts his claim as one for intentional infliction of emotional distress, the Washington Courts have made clear that such a cause of action is synonymous with the tort of outrage. *See Kloepfel v. Bokor*, 149 Wn.2d 192, 194-95, nn.1-2.

REPORT AND RECOMMENDATION
PAGE - 34

to his negligence and medical malpractice claims against the individually named Defendants; and (2) Plaintiff's motion for partial summary judgment (dkt. # 44) as to these claims be DENIED.

This Court further recommends that: (1) Plaintiff's motion for partial summary judgment (dkt. # 44) with respect to the issue of liability as to his general/corporate negligence claim against the State of Washington and the DOC be GRANTED; and (2) Defendants' motion for summary judgment (dkt. # 42) on the issue of contributory negligence be DENIED. To the extent Plaintiff may have intended to seek summary judgment on a statutory medical negligence claim against the State of Washington and the DOC, his motion should be DENIED.

Finally, the Court recommends that Plaintiff's negligent infliction of emotional distress claim be summarily dismissed as it appears Plaintiff has abandoned that claim. A proposed Order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **July 8, 2022**.

DATED this 21st day of June, 2022.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 35